## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| FEDDERS NORTH AMERICA, INC., <u>et</u> <u>al</u>., | Case No. 07-11176 (BLS) (Jointly Administered) |
| Debtors. | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF FEDDERS NORTH AMERICA, INC., <u>et</u> <u>al</u>., on behalf of the Debtors' Estates, | Adversary No. 08-50549 (BLS) |
| Plaintiff, | |
| v. | |
| GOLDMAN SACHS CREDIT PARTNERS L.P., <u>et</u> <u>al</u>., | |
| Defendants. | |

## <u>OPINION</u>[1]

Before the Court are motions to dismiss filed by defendants

herein (i) Bank of America, N.A. ("Bank of America") [Docket No.

6]; (ii) General Electric Capital Corporation ("GECC") [Docket

No. 8]; Highland Capital Management, L.P. ("Highland") [Docket

No. 11]; Goldman Sachs Credit Partners L.P. ("Goldman Sachs")

[Docket No. 12] and certain individual defendants named in this

---

[1]    "The court is not required to state findings or
conclusions when ruling on a motion under Rule 12 . . . ." Fed.
R. Bankr. P. 7052(a)(3). Accordingly, the Court herein makes no
findings of fact and conclusions of law pursuant to Rule 7052 of
the Federal Rules of Bankruptcy Procedure.

adversary proceeding [Docket No. 16].  For the following reasons, the Court will grant the motions in part and deny the motions in part.

## I. BACKGROUND

In 1896, Theodore C. Fedders founded Fedders Corporation, then a metalworking shop located in Buffalo, New York.  About 50 years later, the Fedders family sold a majority interest in the business to a private company called Frank J. Quigan, Inc. ("Quigan").

One of Quigan's employees at the time of the sale was Salvatore Giordano.  Salvatore Giordano joined Quigan in 1927 and later became the president of Quigan.  Following the purchase of Fedders by Quigan, Salvatore Giordano became president of the newly formed Fedders-Quigan.  By the mid-1950s, Fedders-Quigan, which later shortened its name to Fedders, sold over a million room air conditioners in the United States annually.  Throughout the next few decades, Fedders continued to expand under the leadership of Salvatore Giordano.

In 1988, Salvatore Giordano, Jr. assumed his father's role as Fedders' chief executive officer.  The parties generally agree that Fedders was a thriving business at this point in time.  In 1989, for example, Fedders recorded net income of $ 23.7 million dollars on $ 367.6 million in net sales, both of which were records for the company.  These profits were made possible

2

because Fedders' share of the North American market for residential room air conditioners grew from approximately eight percent in 1982 to roughly thirty percent by the end of the 1980s.

In the early 1990s, Fedders' business began to deteriorate under the leadership of Salvatore Giordano, Jr.  Then Michael Giordano, the son of Salvatore Giordano, Jr., assumed the role of president and chief executive officer in 1996.  Salvatore Giordano, Jr. became Fedders' executive chairman at that time.

Over the course of the next ten years, Fedders changed its corporate strategy.  Fedders embarked on a new campaign to move into growth industries that traditionally were not part of the company's operations, such as the commercial HVAC and indoor air quality businesses.  Fedders also moved much of its production to overseas plants during this time.  Fedders incurred substantial debt to pursue these growth and expansion strategies.

The cumulative impact of difficulties encountered in implementing these strategies and the debt assumed by the company for them, as well as a series of moves away from Fedders' traditional business, eventually placed the company in severe financial distress.  By February 2007, Fedders was in default of its obligations under a $75 million secured credit facility with Wachovia Bank ("Wachovia").  Consequently, Wachovia began to limit Fedders' ability to borrow money under the agreement.  This

led to an inability to access new cash.  The liquidity crisis threatened to prevent the company from building inventory and preparing for the upcoming 2007 summer selling season.

Fedders responded to this challenge by initiating a search for replacement financing.  This effort resulted in two new credit facilities aggregating to $90 million being issued to the company on March 20, 2007.  The first was a $50 million revolving facility with defendant Bank of America as administrative agent, collateral agent and lender, and defendant GECC as documentation agent and lender.  The second was a $40 million term facility with defendant Goldman Sachs as administrative agent, collateral agent and lender.  The lenders received certain loan and placement fees under these new financing agreements.

The new financing was used to pay off the defaulted Wachovia loan and to provide working capital prior to the summer selling season.  It was not enough to save the company, however.  It is clear that by May of 2007, Fedders was in default of certain of the covenants pertaining to its earnings that were included in the March 30 loans.  Fedders continued to operate through the summer, but its financial condition only worsened.

Following the resignations of several directors, Fedders and its affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Code") on August 22, 2007. Fedders' bankruptcy case resulted in a series of sales of

4

operating divisions under section 363 of the Code and a Chapter
11 plan of liquidation (the "Plan") that was confirmed by this
Court on August 22, 2008.

Prior to confirmation, the Official Committee of Unsecured
Creditors (the "Committee") filed a motion [Case No. 07-11176
Docket No. 641] seeking derivative standing to pursue a host of
claims (set forth in a proposed complaint attached to and
submitted with the motion) against Bank of America, GECC,
Highland, and Goldman Sachs (hereinafter referred to collectively
as the "Lenders") and a number of former officers and directors
of Fedders (hereinafter referred to collectively as the
"Individual Defendants").  The Court granted the Committee's
motion for standing over the objections of the Lenders and the
Individual Defendants on March 24, 2008.  The Court's order
allowed for the filing of the complaint, but provided that all
other aspects of the litigation would be stayed until after the
effective date of the Plan.  Three days later, the Committee
filed its adversary complaint.

Pursuant to the Plan, the claims asserted in the adversary
complaint were assigned by the Committee to the GUC Liquidating
Trust (the "Trust" or "Plaintiff").  The Lenders and the
Individual Defendants each then timely filed a motion to dismiss
all of the claims in the adversary complaint.  Following a
responsive brief by the Plaintiff and replies from the Lenders

5

and Individual Defendants, the Court heard oral argument on the various motions to dismiss and thereafter took each motion under advisement.

Each motion has been fully briefed and argued.  This matter is ripe for decision.

## II. **JURISDICTION AND VENUE**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of this adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (C), (H), (K) and (O).

## III. **STANDARD OF REVIEW**

The Lenders and Individual Defendants seek dismissal of each count in the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which provides for dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  As noted recently by the U.S. Court of Appeals for the Third Circuit, the standard courts apply when considering such a motion is also related to the requirements set forth in Rule 8 of the Federal Rules of Civil Procedure.  See Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).

A Rule 12(b)(6) motion serves to test the sufficiency of the

factual allegations in a plaintiff's complaint. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993).

"In deciding a motion to dismiss, we must accept all well-pleaded allegations in the complaint as true, and view them in the light most favorable to the plaintiff." Carino v. Stefan, 376 F.3d 156, 159 (3d Cir. 2004). See also Phillips, 515 F.3d at 231 (3d Cir. 2008) (stating that the Supreme Court in Twombly "reaffirmed that, on a Rule 12(b)(6) motion, the facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits"). All reasonable inferences are drawn in favor of the plaintiff. Kost, 1 F.3d at 183. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by, Harlow v. Fitzgerald, 457 U.S. 800, 814-15 (1982).

Rule 8(a) of the Federal Rules of Civil Procedure, meanwhile, requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The statement must provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47

7

(1957).  Under Rule 8, a complaint "does not need detailed
factual allegations, [but] a plaintiff's obligation to provide
the 'grounds' of his 'entitle[ment] to relief' requires more than
labels and conclusions, and a formulaic recitation of the
elements of a cause of action will not do . . . ." <u>Twombly</u>, 550
U.S. at 555 (citations omitted). In other words, "Rule 8(a)(2)
requires a 'showing' rather than a blanket assertion of an
entitlement to relief. . . .  [W]ithout some factual allegation
in the complaint, a claimant cannot satisfy the requirement that
he or she provide not only 'fair notice,' but also the 'grounds'
on which the claim rests." <u>Phillips</u>, 515 F.3d at 232 (citing
<u>Twombly</u>, 550 U.S. at 556 n.3).

Taken together, the Third Circuit has summarized the
pleading standard created by Rule 8 and Rule 12(b)(6) as follows:

> [S]tating ... a claim requires a complaint
> with enough factual matter (taken as true) to
> suggest" the required element.  This "does
> not impose a probability requirement at the
> pleading stage," but instead "simply calls
> for enough facts to raise a reasonable
> expectation that discovery will reveal
> evidence of" the necessary element.

<u>Phillips</u>, 515 F.3d at 234 (internal citations omitted).  This
standard will, of course, govern the motions in this case.

## IV. **DISCUSSION**

A. The Complaint

The complaint in this matter provides a tragic narrative, describing a number of bad business decisions, dating back nearly fifteen years.  Among other things, these decisions saw Fedders entering into markets in which it had little or no experience while simultaneously abandoning the markets and customer base that had made it a once-thriving company.

The complaint specifically takes issue with three relatively recent decisions, each approved by Fedders' board of directors. The first of these three decisions was the July 2006 execution of "change of control" agreements that would have given five company insiders severance payments upon a change of control in the company.  More specifically, defendants Michael Giordano, Robert L. Laurent, Jr., Kent E. Hansen, Peter Gasiewicz, and Warren Emley received contracts that provided for severance payments equal to 2.9 times their annual salary and average bonus for the past three years, and certain other benefits to the executives in the event of a change in control of the company.  (Compl. at ¶ 59).  The complaint does not allege that these payments were ever actually paid, however, nor can the Court infer that they were since the complaint makes clear that there was never a change in control of the company.

The second of these three decisions was the July 28, 2006

9

decision to enter into a new employment agreement with Salvatore Giordano, Jr.  Under the agreement, Salvatore Giordano, Jr. was given the same severance upon a change in control as the five insiders discussed above, as well as a minimum base salary of $625,000 and participation in incentive, savings, and retirement plans.  (Compl. at ¶ 58).  Moreover, the agreement provided that Giordano would not have to repay personal loans he had taken from the company (which aggregated to $6 million) while he remained employed by Fedders, and that the debts would be forgiven if he ever resigned, was terminated without cause, or if there was a change in control at Fedders.  (Compl. at ¶¶ 56-57).

Finally, the third action complained of was the March 2007 decision to enter into the term and revolving loan facilities with Goldman Sachs and Bank of America discussed above.

The complaint also alleges that "members of the Board, using insider information, sold personally owned Fedders stock – before the market had a chance to learn of and react to the depth of Fedders' financial distress."  (Compl. at ¶ 96).  The complaint only identifies one of these directors, however.  Plaintiffs allege that defendant Herbert A. Morey sold 30,000 of his shares of Fedders stock on June 13, 2007.  (Id.).

Based on these three decisions and the insider trading allegations, the complaint asserts sixteen causes of action against either the Lenders, some or all of the Individual

10

Defendants, or both.  Count I is a claim against certain insiders of Fedders for breach of fiduciary duty.  Count II asserts a claim against Fedders' outside directors for breach of fiduciary duty.  Count III is a claim asserted against the Lenders for aiding and abetting breach of fiduciary duty.  Counts IV and V seek the avoidance and recovery of fraudulent conveyances allegedly made to both the Lenders and the Individual Defendants, and Count VI asserts a claim for aiding and abetting a fraudulent conveyance against the Lenders and the Individual Defendants. Count VII is a claim against the Individual Defendants for waste. Counts VIII and IX assert claims of tortious interference with contractual relations and tortious interference with prospective business advantage, both against the Lenders.  Count X asserts a claim for "improvident lending" against the Lenders.  Count XI asserts a claim for unjust enrichment, apparently against both the Lenders and Individual Defendants.  Count XII advances a claim against the Lenders for breach of the covenants of good faith and fair dealing that are inherent in every contract. Count XIII asserts a claim against the Lenders for equitable subordination.  Count XIV seeks to recharacterize the loans made by the Lenders as equity investments.  Counts XV, XVI, and XVII, for repayment of professional fees, surcharge and lien avoidance, and a claim objection, were voluntarily dismissed or released under the Plan.

B. <u>Analysis</u>

    **1. Breach of fiduciary duty - insider defendants**

        a. <u>Governing law</u>

As a threshold matter, the Court notes that Plaintiff has been granted derivative standing on behalf of Fedders, a Delaware corporation, in this lawsuit.[2]  Under the internal affairs doctrine, only one state has the authority to regulate a corporation's internal affairs – matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders.  <u>Edgar v. MITE Corp.</u>, 457 U.S. 624, 645 (1982).  The state given this authority, of course, is the state under which the corporation in question is chartered.  <u>Id.</u>

The courts have long recognized that few, if any, claims are more central to a corporation's internal affairs than those relating to alleged breaches of fiduciary duties by a corporation's directors and officers.  <u>See, e.g.</u>, <u>In re Topps Co.</u>

---

      [2]    Fedders' state of incorporation is not expressly stated in Plaintiff's complaint.  Despite this, the Court will consider this fact in deciding what law governs certain claims for purposes of these motions to dismiss.  The Court deems this appropriate because Fedders' state of incorporation is a matter of public record, and because this fact was previously established in Fedders' underlying bankruptcy case.  <u>See</u> <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1195 (3d Cir. 1993) (noting that a court considering a motion to dismiss may consider "allegations contained in the complaint, exhibits attached to the complaint and matters of public record").

Shareholders Litigation, 924 A.2d 951 (Del. Ch. 2007).
Accordingly, Delaware law will govern Plaintiff's claims for
breach of fiduciary duty.

The Delaware Supreme Court recognized long ago that where
there is a separation of legal control from beneficial ownership,
equity imposes fiduciary duties upon those in control to protect
the beneficiaries who are not in a position to protect
themselves.  See Malone v. Brincat, 722 A.2d 5, 9 (Del. 1998).
Thus, seizing upon the fact that Delaware corporate law, like
that of other states, provides for a separation of control and
ownership, Delaware's Supreme Court has long held that the
directors and officers of a Delaware corporation owe fiduciary
duties to the corporation and its shareholders.  See, e.g., Guth
v. Loft, 5 A.2d 503, 510 (Del. 1939).

More specifically, the Delaware Supreme Court has held that
directors and officers of a Delaware corporation owe the
corporation and its shareholders a "triad" of duties.  Malone v.
Brincat, 722 A.2d at 10.  This triad is composed of the duty of
care, the duty of loyalty, and the duty to act in good faith.
Id.  The Delaware Supreme Court has stated that this "triparte
fiduciary duty does not operate intermittently but is the
constant compass by which all director actions for the
corporation and interactions with its shareholders must be
guided."  Id.

A plaintiff cannot prove a breach of the duty of care without a showing of gross negligence.  See, e.g., Cargill, Inc. v. JWH Special Circumstance LLC, 959 A.2d 1096, 1113 (Del. Ch. 2008) (noting "a corporate director is only considered to have breached his duty of care in instances of gross negligence").  The exact behavior that will constitute gross negligence varies based on the situation, but generally requires directors and officers to fail to inform themselves fully and in a deliberate manner.  See Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 368 (Del. 1993) (collecting cases explaining the requirements established by the duty of care in a variety of settings).  For instance, the Delaware Court of Chancery has recently observed that gross negligence may be pled by a complaint alleging "that a board undertook a major acquisition without conducting due diligence, without retaining experienced advisors, and after holding a single meeting at which management made a cursory presentation."  Trenwick America Litigation Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 194 (Del. Ch. 2006), aff'd, 931 A.2d 438 (Del. 2007).

By contrast, the duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."  Cede & Co. v. Technicolor, Inc., 634 A.2d at 361.  "To state a legally

14

sufficient claim for breach of the duty of loyalty, plaintiffs must allege facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs." Joyce v. Cuccia, 1997 WL 257448, at *5 (Del. Ch. May 14, 1997).

The duty to act in good faith, meanwhile, is a subsidiary element of the duty of loyalty. Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006). The behavior that must be shown to prove a violation of the duty to act in good faith "requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)." Id. at 369. The Delaware Supreme Court has identified three examples of conduct that may establish a failure to act in good faith. First, it has held that such a failure may be shown where a director "intentionally acts with a purpose other than that of advancing the best interests of the corporation." In re Walt Disney Co. Derivative Litigation, 906 A.2d 27, 67 (Del. 2006). Second, it has held that a failure may be proven where a director "acts with the intent to violate applicable positive law." Id. Third, it has held that a failure may be shown where the director "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." Id. The court noted, however, that this list of examples is not necessarily exclusive. More specifically, it said there "may be other examples of bad faith

15

yet to be proven or alleged, but these three are the most salient." Id.

It should also be noted that section 102(b)(7) of the Delaware General Corporate Law allows a Delaware corporation to place a provision in its certificate of incorporation that exculpates its directors (but not officers) from monetary liability for a breach of the duty of care asserted by the corporation or its shareholders, but not for conduct that constitutes a failure to act in good faith or a breach of the duty of loyalty. See 8 Del. C. § 102(b)(7). Because most large Delaware corporations, including the Debtors, have added such an exculpatory provision to their certificate of incorporation, litigation concerning the duty of care is rare today. The issue of whether directors have acted in good faith, by contrast, has become increasingly litigated. See generally Sarah Helene Duggin & Stephen M. Goldman, Restoring Trust in Corporate Directors: The Disney Standard and the "New" Good Faith, 56 Am. U. L. Rev. 211 (2006).

   b. Application of governing law

In Count I of the complaint, Plaintiff alleges that the insider defendants "breached their fiduciary duties, including (but not limited to) breaching: (a) their duties of loyalty; (b) their duties of care; and (c) their duties of good faith." (Compl. at ¶ 101). Plaintiff further alleges that "their

16

misconduct was intentional and/or in knowing violation of law"
and "cannot be attributed to any rational business purpose."
(Compl. at ¶ 102).

Drawing all reasonable inferences in favor of Plaintiff, the
Court concludes that the complaint fails to plead any facts
against the non-director, insider defendants that state a cause
of action for breach of any fiduciary duty.[3]  The "change of
control" agreements were each approved by a disinterested
majority of Fedders' board of directors, and there is no specific
allegation that any of the non-director, insider defendants
misled the board, failed to perform any assigned duties relating
to the approval of these agreements, or otherwise acted
improperly in convincing the board to adopt them – let alone any
facts to support such an allegation.

As for the 2007 loan transaction, Plaintiff alleges that the
insider defendants led Fedders into the financing because they
were "terrified of losing control of the family business and of
losing their substantial salaries, bonus compensation and other
perks."  (Compl. at ¶ 64).  That is, Plaintiff alleges that the
insider defendants "began a search for new financing to put off –

---

[3]     The non-director, insider defendants include: Michael
Giordano, president and chief executive officer of Fedders;
Robert L. Laurent, executive vice president for finance and
acquisition, as well as chief financial officer; Kent E. Hansen,
executive vice president for administration and secretary; Peter
Gasiewicz, senior vice president; and Warren Emley, vice
president of Fedders and Fedders' Asia Pacific.

for just a little longer – the day of reckoning for the Insiders and the discovery of their misconduct."   (<u>Id.</u>).

At bottom, Plaintiff takes issue with the wisdom of decisions of the insiders, viewed through the prism of Fedders' subsequent collapse.  As noted in <u>Trenwick</u>, however, business failure is an ever-present risk.  The mere fact that a strategy turned out poorly is in itself insufficient to create an inference that the officers and directors who oversaw the strategy breached their fiduciaries duties.  <u>Trenwick</u>, 906 A.2d at 193.  Even when a company is insolvent, its directors and officers may "take action that might, if it does not pan out, result in the firm being painted in a deeper hue of red."  <u>Id.</u> at 174.  The fact that a firm is insolvent does not mean that the company's officers and directors "cannot choose to continue the firm's operations in the hope that they can expand the inadequate pie such that the firm's creditors get a greater recovery."  <u>Id.</u>

Delaware law requires that a plaintiff plead facts supporting an inference that officers and directors committed a cognizable breach of duty.  <u>Id.</u> at 194.  Simply alleging that a corporation was insolvent and took on further debt to continue operating is not enough to plead a claim for breach of fiduciary duty.  Likewise, the fact that the officers and directors continued to be employed and compensated during this period, standing alone, is not sufficient to support a claim for breach

18

of fiduciary duty.  See, e.g., Grobow v. Perot, 539 A.2d 180, 188
(Del. 1988) ("The only averment permitting such an inference [of
financial interest on the part of the directors] is the
allegation that all GM's directors are paid for their services as
directors.  However, such allegations, without more, do not
establish any financial interest."), overruled on other grounds
by Brehm v. Eisner, 746 A.2d 244, 253 (Del. 2000).

The complaint alleges no such facts against the insider
defendants with regard to the 2007 financing.  Indeed, the only
specific allegation against the insider defendants is that some
of them may have been responsible for the redaction of certain
key financial terms from the version of Fedders' Form 8-K filed
with the Securities and Exchange Commission and viewable by the
public.  (Compl. at ¶¶ 74-77).  Such requests to the SEC for
confidential treatment, however, are both allowed under U.S.
securities laws and regularly granted by the SEC, and there are
no facts alleged in the complaint to indicate that the request in
this case was done for an improper reason.  Accordingly, Count I
is dismissed as to the non-director, insider defendants.[4]

_____

    [4]    The Court will address the allegations with respect to
Count I against Fedders' sole inside director, Salvatore
Giordano, Jr., in concert with its analysis of Count II.  Because
the facts contained in the complaint are such that they only
state a claim for breach of fiduciary duty against Salvatore
Giordano, Jr. (or fail to do so) for the same reasons and on the
same terms that they would state a claim against the outside
directors (except for defendant Herbert A. Morey, as noted
below), the Court's analysis with respect to Count II is

## 2. Breach of fiduciary duty - outside directors

a. <u>The change of control agreements, Salvatore
Girodano, Jr.'s agreement, and the loan transaction</u>

The complaint has not pled any facts to support a duty of
loyalty claim against Fedders' outside directors, such as
entering into an interested transaction, in connection with the
change of control agreements, Salvatore Girodano, Jr.'s
employment agreement, and the loan transaction.  The complaint
also fails to state a claim for breaching the duty to act in good
faith with regard to these transactions.  Plaintiff has not pled
facts showing that the directors intentionally abdicated their
directorial duties in the face of a known duty to act.  Likewise,
Plaintiff has not pled facts indicating that the directors
intended to violate applicable positive law.  Finally, Plaintiff
has alleged, in a conclusory fashion, that the outside directors
intentionally acted against the interest of Fedders by seeking to
avoid filing bankruptcy so as to remain in office and continue
collecting director fees.  (Compl. at ¶¶ 2(c), 83) ("Far from
doing their job and stopping this madness, the Outside Directors
betrayed the Debtors and, like the Insiders, did so to keep their
personal paychecks coming as long as possible.").  But Plaintiff
has not pled facts to support this allegation, and, moreover, the

---

dispositive of Count I against Giordano.

authorities are clear that, under Delaware law, simple allegations of such "entrenchment motives," without more, are insufficient to state a claim that directors are financially interested.  See Orman v. Cullman, 794 A.2d 5, 28-29 n.62 (Del. Ch. 2002) (collecting cases).  This is also in keeping with caselaw holding that the decision whether to file for bankruptcy protection or not is generally a matter of directors' business judgment.  See Odyssey Partners, L.P. v. Fleming Companies, Inc., 735 A.2d 386, 416-20 (Del. Ch. 1999).

The Court does find that Plaintiff has pled sufficient facts to support a claim for breach of the duty of care by Fedders' directors in connection with the loan transaction entered into with Lenders, however.  The complaint pleads facts indicating that the directors approved the transaction with Lenders even though some due diligence which is typically conducted by a borrower in the position of Fedders was not undertaken.  These include allegations that Fedders never obtained a financial assessment verifying that it would be able to comply with the covenants contained in the financing it obtained through Lenders, [Compl. at ¶ 66], and that the financing agreements did not require a "clean" opinion by Fedders' auditors, which Plaintiff alleges is a typical requirement for such transactions.  [Compl. at ¶ 72].  Allegations such as these are similar to the hypothetical gross negligence claim discussed by Vice Chancellor

21

Strine in <u>Trenwick America</u>.[5]

Fedders' certificate of incorporation exculpates Fedders' directors from paying monetary damages for breaching the duty of care, however, and Plaintiff seeks only monetary damages for this breach.  Because this claim is not inextricably intertwined with other well-pled claims for breach of fiduciary duty, this results in Plaintiff failing to state a claim for which relief may be granted as to the duty of care.  <u>See, e.g.</u>, <u>Malpiede v. Townson</u>, 780 A.2d 1075, 1093-96 (Del. 2001); <u>In re Lukens Inc.</u> <u>Shareholders Litigation</u>, 757 A.2d 720, 728 (Del. Ch. 1999).

        b. <u>Insider trading</u>

Under Delaware law, a claim for breach of the duty of loyalty premised on insider trading, also known as a <u>Brophy</u> claim,[6] arises where "1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance

_____

        [5]    The court in <u>Trenwick</u> noted, in the context of another bankrupt corporation, that facts showing "that a board undertook a major acquisition without conducting due diligence, without retaining experienced advisors, and after holding a single meeting at which management made a cursory presentation" would <u>only</u> support a claim for the breach of the duty of care.  In other words, such conduct is insufficient to state a claim for breaching the duty of loyalty or the duty to act in good faith. <u>Trenwick America Litigation Trust v. Ernst & Young, L.L.P.</u>, 906 A.2d at 194.

        [6]    <u>Brophy v. Cities Serv. Co.</u>, 70 A.2d 5 (Del. Ch. 1949).

of that information." In re Oracle Corp., 867 A.2d 904, 934
(Del. Ch. 2004), aff'd, 872 A.2d 960 (Del. 2005).

The complaint paints with a broad brush, alleging that
several members of the board, using insider information, sold
their Fedders' stock in the months leading up to Fedders'
bankruptcy.    [Compl. at ¶ 96].  But the complaint identifies
only a single director who sold his Fedders stock during a time
when directors could have possessed material, nonpublic
information about the company's financial health.  The complaint
alleges that Herbert A. Morey sold 30,000 shares of his Fedders
stock on June 13, 2007, [Id.], but contains no such allegations
as to other directors – no mention of actual sales, much less
dates of sale, amounts of sale, or other facts.

Read in the context of the other facts pled in the
complaint, the Court holds that the complaint states a claim
against Herbert A. Morey for breach of the duty of loyalty
arising from insider trading that is sufficient to withstand a
motion to dismiss.  There are no facts from which the Court can
infer that the other directors engaged in such conduct, however.

Accordingly, Count II must be dismissed as to all defendants
except Herbert A. Morey.[7]

---

[7]    For the reasons noted in footnote 4, Count I will also
be dismissed as to Salvatore Giordano, Jr.

23

### 3. Aiding and abetting breach of fiduciary duty - Lenders

As with the breach of fiduciary duty claims, the internal affairs doctrine compels the Court to apply Delaware law to the claim for aiding and abetting breach of fiduciary duty asserted against the Lenders.  See Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1038 (Del. Ch. 2006) (noting that aiding and abetting claims are essentially civil conspiracy claims brought in the context of matters relating to the internal affairs of corporations).  See also In re American Intern. Group, Inc., 965 A.2d 763, 822 (Del. Ch. 2009).  Under Delaware law, a valid claim for aiding and abetting a breach of fiduciary duty requires: (1) the existence of a fiduciary relationship; (2) proof that the fiduciary breached its duty; (3) proof that a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) a showing that damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary. Cargill, Inc. v. JWH Special Circumstance LLC, 959 A.2d 1096, 1125 (Del. Ch. 2008).

The Plaintiff has pled sufficient facts for its aiding and abetting breach of fiduciary duty claim against the Lenders to withstand a motion to dismiss.  As noted above, the Court concludes Plaintiff has sufficiently pled a claim against the

director Individual Defendants for a breach of the duty of care.[8]
Drawing all reasonable inferences in favor of Plaintiff, the
Court holds that the complaint contains enough facts to infer
plausible allegations that the Lenders knowingly participated in
a breach of the duty of care by Fedders' directors and that
Fedders was damaged as a result.  Therefore, the motions to
dismiss will be denied as to Count III.[9]

### 4. Fraudulent conveyance - section 548(a)(1) - all parties

Generally speaking, Federal Rule of Civil Procedure 9(b)
requires those asserting fraudulent transfer claims in bankruptcy
proceedings to plead them with specificity.  See OHC Liquidation
Trust v. Nucor Corp. (In re Oakwood Homes Corp.), 325 B.R. 696,

---

[8]    Once again, this duty of care claim is dismissed as to
the director Individual Defendants because the § 102(b)(7)
provision in Fedders' certificate of incorporation exculpates
them from monetary liability on such a claim, and because only
monetary remedies are sought against them by Plaintiff.  The fact
that Fedders' directors can be held harmless for breaching their
duty of care does not necessarily prevent the Court from
ultimately finding that a breach of the duty of care occurred and
was knowingly assisted by some or all of the Lenders, however.
See Khanna v. McMinn, 2006 WL 1388744 at * 25 (Del. Ch. May 9,
2006) (stating, in a different context, that "charter provisions
adopted under § 102(b)(7) merely work to exculpate liability, but
do not erase the underlying breach of fiduciary duty").  But see
In re Radnor Holdings Corp., 353 B.R. 820, 843, 844 n.3 (Bankr.
D. Del. 2006).

[9]    The Lenders have asserted a number of affirmative
defenses such as in pari delicto that, in some instances, can
defeat a claim such as this one at this stage of a case.  Here,
however, the Court concludes that further factual development is
needed in order to determine the merit of these defenses.

25

698 (Bankr. D. Del. 2005) ("There is no question that Rule 9(b)
applies to adversary proceedings in bankruptcy which include a
claim for relief under §§ 544 or 548, whether it is based upon
actual or constructive fraud."). <u>See also</u> <u>Pardo v. Gonzaba (In
re APF Co.)</u>, 308 B.R. 183, 188 (Bankr. D. Del. 2004). <u>Contra</u>
<u>Astropower Liquidating Trust v. Xantrex Techn. Inc. (In re
Astropower Liquidating Trust)</u>, 335 B.R. 309, 333 (Bankr. D. Del.
2005) (rejecting application of Rule 9(b) to a constructive
fraudulent transfer claim).  The requirements of Rule 9(b) are
relaxed and interpreted liberally where a trustee, or trust
formed for the benefit of creditors, as here, is asserting the
fraudulent transfer claims, however.  <u>In re APF Co.</u>, 308 B.R. at
188.  This is because of the trustee's "inevitable lack of
knowledge concerning acts of fraud previously committed against
the debtor, a third party." <u>Schwartz v. Kursman (In re Harry
Levin, Inc. t/a Levin's Furniture)</u>, 175 B.R. 560, 567-68 (Bankr.
E.D. Pa. 1994).  With these principles in mind, the Court now
turns to the substance of Plaintiff's claims.

### a. Actual Fraud

Section 548(a)(1) of the Code grants a trustee the power to
avoid any transfer by a debtor of an interest in property made
within two years before the filing of a bankruptcy petition if
the transfer was actually or constructively fraudulent. 11 U.S.C.
§ 548(a)(1).  Under Section 548(a)(1)(A), transfers or

26

obligations incurred by a debtor may be avoided if made with actual intent to hinder, delay, or defraud a past or future creditor. The definition of "transfer" is broad, and includes "the creation of a lien," such as a security interest, and "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with-- (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54).

To avoid a transaction under Section 548(a)(1)(A), a plaintiff must show that the transaction was made "with actual intent to hinder, delay or defraud" creditors. 11 U.S.C. § 548(a)(1); In re Hechinger Inv. Co. of Del., 327 B.R. 537, 550 (D. Del. 2005). Because direct evidence of fraudulent intent is often unavailable, courts usually rely on circumstantial evidence to infer fraudulent intent. Id. at 550-51. See also, Dobin v. Hill (In re Hill), 342 B.R. 183, 198 (Bankr. D. N.J. 2006) ("Because actual fraud is rarely proven by direct evidence, as individuals are rarely willing to admit such an intent, courts may infer actual intent by examining the circumstances and considering whether various 'badges of fraud' are present.") (citing In re G-I Holdings, Inc., 313 B.R. 612, 640-41 (Bankr. D. N.J. 2004)).

The "badges of fraud" that courts often refer to include, but are not limited to: (1) the relationship between the debtor

27

and the transferee; (2) consideration for the conveyance; (3)
insolvency or indebtedness of the debtors; (4) how much of the
debtor's estate was transferred; (5) reservation of benefits,
control or dominion by the debtor over the property transferred;
and (6) secrecy or concealment of the transaction.  Hechinger
Inv. Co., 327 B.R. at 551 (citations omitted).  The presence or
absence of any single badge of fraud is not conclusive.  In re
Hill, 342 B.R. at 198. "The proper inquiry is whether the badges
of fraud are present, not whether some factors are absent.
Although the presence of a single factor, i.e. badge of fraud,
may cast suspicion on the transferor's intent, the confluence of
several in one transaction generally provides conclusive evidence
of an actual intent to defraud." Id. (quoting Gilchinsky v.
Nat'l Westminster Bank, 732 A.2d 482, 489 (N.J. 1999)).
Additionally, a court may consider other factors relevant to the
transaction. In re Hill, 342 B.R. at 198-99.

Taking all facts in the complaint as true and drawing all
reasonable inferences in favor of Plaintiff, the Court holds that
Plaintiff has failed to state a claim against the Lenders under
section 548(a)(1)(A).  Plaintiff pleads a single badge of fraud –
Fedders' insolvency at a time shortly before it arranged to
borrow from Lenders and granted Lenders a security interest in
return.  (Compl. at ¶ 63).  Though Plaintiff argues that it has
also pled concealment of the transaction, the facts pled in the

28

complaint show that Fedders' dealings with Lenders were anything but concealed.  Fedders' borrowing was disclosed in a public filing with the SEC, as was the fact that it was seeking the refinancing it ultimately obtained from the Lenders.  (Compl. at ¶¶ 68, 74-77, 85).  The fact that some financial covenants in the loan agreement were redacted pursuant to a request to the SEC for confidential treatment does not mean Fedders' transfer to the Lenders – memorialized in a security interest that was also publicly recorded – was materially concealed.  Given these facts, and the absence of facts indicating anything other than an arm's length relationship between Fedders and the Lenders, Plaintiff has failed to plead a claim for an actually fraudulent transfer against the Lenders, even under the more lenient requirements of Rule 8.

As for the Individual Defendants, the Court is faced with a complaint that is left wanting for transfers.  The complaint discusses "change of control" agreements that would have given several of the insider Individual Defendants large severance payments in the event that control of Fedders changed hands, (Compl. at ¶ 59), but as the narrative in the complaint makes clear, this change never occurred and the payments were never made.

Thus, for all the discussion of the severance top management would have gotten under the change of control agreements, the

complaint does not – indeed cannot – allege that any of the
Individual Defendants actually received a transfer under these
agreements.  The complaint also makes reference to "exorbitant
salaries," "large bonuses," and "interest free" loans given to
the Individual Defendants. (Compl. at ¶ 53).  But with the
exception of Salvatore Giordano, Jr., the complaint fails to
state who received these perks, in what amounts, and under what
circumstances.  Instead, the complaint simply alleges that the
transfers to the insiders and outside directors "included (but
were not limited to) all forms of compensation that they
received."  (Compl. at ¶ 116).  These vague references are
insufficient to state a claim for actually fraudulent transfers.

As for Salvatore Giordano, Jr., the complaint pleads that
revisions to his employment agreement, executed on July 28, 2006,
provided him with a potential release of $6 million in interest-
free loans he had taken from Fedders at an earlier, unspecified
date.  (Compl. at ¶¶ 56-58).  Because of the nature of Fedders'
relationship to Giordano, and the possibility that it might later
prove that this contractual release resulted in a transfer to
Giordano, Plaintiff has sufficiently pled a claim for an actually
fraudulent transfer against Salvatore Giordano, Jr.

### b. Constructive Fraud

Under section 548(a)(1)(B), any transfer or obligation
incurred by a debtor for which it "received less than a

reasonably equivalent value in exchange" may be avoided if
any one of four conditions set forth in section
548(a)(1)(B)(ii)(I)-(IV) are met, i.e. (I) the debtor was or
thereby became insolvent, (II) the debtor was engaged in business
or was about to engage in business for which any property
remaining with the debtor was an unreasonably small capital,
(III) the debtor intended to incur or believed it would incur
debts that would be beyond its ability to repay as they matured,
or (IV) the debtor made the transfer or incurred the obligation
to or for the benefit of an insider under an employment contract
and not in the ordinary course of business.  Fraud upon the
creditors is presumed once the plaintiff establishes the
requisite elements set forth in the statute. See Fruehauf
Trailer, 444 F.3d at 210 (citing Mellon Bank, N.A. v. Metro
Comms., Inc., 945 F.2d 635, 645 (3d Cir. 1991)).

   The term "reasonably equivalent value" is not expressly
defined by the Code. Rather, Congress left to the courts the task
of setting forth the scope and meaning of this term, and courts
have rejected the application of any fixed mathematical formula
to determine reasonable equivalence.  Peltz v. Hatten, 279 B.R.
710, 736 (D. Del. 2002).  As the Third Circuit has noted, "a
party receives reasonably equivalent value for what it gives up
if it gets 'roughly the value it gave.'" VFB LLC v. Campbell Soup

31

Co., 482 F.3d 624, 631 (3d Cir. 2007) (citing <u>Fruehauf Trailer</u>, 444 F.3d at 213).

In determining the question of whether a debtor received reasonably equivalent value, a court looks to the "totality of the circumstances" of the transfer, including the following factors: (i) the "fair market value" of the benefit received as a result of the transfer, (ii) "the existence of an arm's-length relationship between the debtor and the transferee," and (3) the transferee's good faith. <u>Fruehauf Trailer</u>, 444 F.3d at 213 (quoting <u>In re R.M.L.</u>, 92 F.3d at 148-49, 153 (3d Cir. 1996)).

Taking all facts in the complaint as true and granting all reasonable inferences to Plaintiff, the Court cannot conclude that the complaint successfully pleads that Fedders received less than "reasonably equivalent value" from the Lenders in exchange for the security interest, fees, and expenses the Lenders received from Fedders. The consideration received by Fedders from the Lenders is set forth in the complaint, (<u>see</u> Compl. at ¶ 85 (noting that Fedders' drew the total balance of the term loan immediately upon closing)), and is not sufficiently alleged to be less than reasonably equivalent value. Accordingly, the complaint fails to state a claim for constructively fraudulent transfer against the Lenders.

As for the Individual Defendants, the failure to identify transfers again proves fatal to the claims asserted against all

32

but Salvatore Giordano, Jr.

As to Giordano, Plaintiff has successfully pled a constructively fraudulent transfer claim against Giordano.  (See Compl. at ¶¶ 56-57).  Based on the facts contained in the complaint, the Court deems it plausible that Fedders received less than reasonably equivalent value from Giordano in exchange for an interest-free loan, and that Fedders made the transfer or incurred the obligation to or for the benefit of an insider under an employment contract and not in the ordinary course of business.

On account of the foregoing, Count IV is dismissed as to all defendants except Salvatore Giordano, Jr.

**5. Fraudulent conveyance - applicable state law - all parties**

Under section 544(b) of the Code, a trustee in bankruptcy may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable state law by a creditor holding an allowable, unsecured claim.  11 U.S.C. § 544(b).  Plaintiff invokes this remedy, but fails to identify any state law or statute that would allow it to avoid transfers made by Fedders to any of the defendants.

Based on the facts in the complaint, the Court concludes that only the Delaware and/or New Jersey versions of the Uniform

33

Fraudulent Transfer Act (UFTA) are implicated here.  Both
statutes track the language of each other, and also mirror the
language of section 548(a)(1)(A) and (B) of the Code.  See  6
Del. C. §§ 1301-1311; N.J.S.A. §§ 25:2-20 to 25:2-34.  Because of
this, it should come as no surprise that Plaintiff's success in
pleading claims under Count V tracks its success under Count IV.
Accordingly, for the reasons previously stated above, Count V is
dismissed as to all defendants except Salvatore Giordano, Jr. for
the reasons stated in Count IV.

**6. Aiding and abetting a fraudulent conveyance - insiders
and Lenders**

Count VI asserts a claim against the Lenders and the
Individual Defendants for "aiding and abetting a fraudulent
conveyance."  Plaintiff alleges that "the Insiders and the
Lenders "knew that transfers were occurring within the meaning of
11 U.S.C. §548(a)(1) and applicable state laws," and that the
insider Individual Defendants and Lenders "aided, abetted and
benefited [sic] from fraudulent transfers within the meaning of
11 U.S.C. §548(a)(1) and applicable state laws."  (Compl. at ¶¶
130-131).

The Court notes that a handful of courts have recognized a
cause of action for either aiding and abetting a fraudulent
conveyance or conspiracy to commit a fraudulent conveyance under
state law, including the law of New Jersey.  See Bondi v.

Citigroup Inc., 2005 WL 975856 at *20 (N.J. Super. Ct. Law Div.
Feb. 28, 2005), aff'd, 878 A.2d 850 (N.J. 2005).  Whether any
state law recognizes such a claim, even the law of a controlling
state such as New Jersey or Delaware here, is irrelevant in
bankruptcy proceedings, however.

Even where a trustee (or party standing in a trustee's
shoes, such as Plaintiff here) is given a lien creditor's rights
under the law of a state that does recognize a claim such as
"aiding and abetting a fraudulent transfer" or "conspiracy to
commit a fraudulent transfer," bankruptcy courts have refused to
permit trustees to use section 544(b) to pursue such a claim.
For example, the court in In re Hamilton Taft & Co. was presented
with a trustee who attempted to use section 544(b) to pursue a
claim for damages, premised on the theory that the defendant had
aided and abetted a fraudulent transfer.  See In re Hamilton Taft
& Co., 176 B.R. 895 (Bankr. N.D. Cal. 1995), aff'd, 196 B.R. 532
(N.D. Cal. 1995), aff'd, 114 F.3d 991 (9th Cir. 1997).  The
trustee was asserting a claim under the law of California, which
is one of the few states that recognize non-beneficiary,
non-transferee liability for helping execute a fraudulent
transfer. See id. at 902.  Still, the court dismissed the
trustee's claim for want of standing.  The court held that a
bankruptcy trustee is not authorized to pursue every state law
action that creditors of the debtor might pursue, only those that

35

the Code expressly allows the trustee to pursue.  The trustee's
only authority to assert a creditor's state law causes of action
related to fraudulent conveyances is found in section 544(b) of
the Code, the court held, and section 544(b) "only permits the
trustee to <u>avoid</u> a fraudulent transfer."  <u>Id.</u> (emphasis added).
This holding is consistent with other cases that have refused to
allow trustees to use section 544(b) to assert claims for damages
under state law, some of which even go so far as to call a
trustee's argument that he is given such power by section 544(b)
"flatly wrong."  <u>See</u> <u>In re Canyon Systems Corp.</u>, 343 B.R. 615,
656 (Bankr. S.D. Ohio 2006); <u>see also</u> <u>Kleven v. Stewart (In re</u>
<u>Myers)</u>, 320 B.R. 667, 669 (Bankr. N.D. Ind. 2005).

        Courts have also cited the language of Bankruptcy Code
section 550 as support for the idea that Congress did not intend
to empower trustees to assert damage claims under state law for
aiding and abetting a fraudulent transfer.  The court in <u>In re</u>
<u>Brentwood Lexford Partners LLC</u>, for instance, rejected a
trustee's claim for damages arising from an alleged civil
conspiracy to violate the Texas UFTA.  <u>In re Brentwood Lexford</u>
<u>Partners LLC</u>, 292 B.R. 255 (Bankr. N.D. Tex. 2003).  The court
reasoned that, under the Code, the trustee's remedy for an
avoided transfer is addressed by a specific statutory provision,
section 550, and that provision only allows the trustee to
recover up to the amount of the transfer from a transferee, or a

party for whose benefit the transfer was made.  <u>Id.</u> at 275.  The court held that to allow any other recovery "could lead to a result that expands remedies beyond § 550," and that "the court cannot invoke state law remedies to circumvent or undermine the specific remedy legislated by Congress for the avoidance of a fraudulent transfer."  <u>Id.</u>

Likewise, the authorities are also clear that there is no such thing as liability for aiding and abetting a fraudulent conveyance or conspiracy to commit a fraudulent transfer as a matter of federal law under the Code.  See <u>In re McCook Metals LLC</u>, 319 B.R. 570, 591 (Bankr. N.D. Ill. 2005); <u>In re H. King & Associates</u>, 295 B.R. 246, 293 (Bankr. N.D. Ill. 2003); <u>In re Ampat Southern Corp.</u>, 128 B.R. 405, 410-11 (Bankr. D. Md. 1991).

The Court finds each of these lines of authority persuasive. Accordingly, Plaintiff cannot bring a state law claim for aiding and abetting a fraudulent transfer in this Court, and cannot bring a claim for aiding and abetting a fraudulent conveyance as a matter of federal law.  Count VI must be dismissed.

### 7. Waste - insiders and outside directors

Much like a claim for breach of fiduciary duty, a waste claim implicates a matter peculiar to corporations – activities concerning the relationships <u>inter se</u> of the corporation, its directors, officers and shareholders.  See, e.g., <u>In re First Interstate Bancorp Consol. Shareholder Litigation</u>, 729 A.2d 851,

862-863 (Del. Ch. 1998) (noting that a waste claim seeks to remedy an injury to the corporation inflicted by directors or officers, and can be asserted by shareholders only derivatively). Therefore, the internal affairs doctrine dictates that Delaware law govern Plaintiff's waste claim.

Under Delaware law, a corporate waste claim "must rest on the pleading of facts that show that the economics of the transaction were so flawed that no disinterested person of right mind and ordinary business judgment could think the transaction beneficial to the corporation" in order to survive a motion to dismiss. Harbor Fin. Partners v. Huizenga, 751 A.2d 879, 893 (Del. Ch. 1999).  Stated slightly differently, "if, under the facts pled in the complaint, 'any reasonable person might conclude that the deal made sense, then the judicial inquiry ends.'" Id. (quoting Steiner v. Meyerson, 1995 WL 441999 at *1, (Del. Ch. Jul. 19, 1995)).

Plaintiff's complaint contains insufficient detail on its face for the Court to determine whether a waste claim is asserted against the Individual Defendants in connection with the disputed refinancing, in connection with compensation paid to certain insiders, or both.  This uncertainty is of no matter, however, because the complaint fails to plead a claim for waste with regard to any action.  Drawing all reasonable inferences in favor of Plaintiff, the Court concludes that the facts pled in the

38

complaint fail to show that the Individual Defendants engaged in a transaction which no reasonable person could conclude made economic sense for Fedders.  Accordingly, Count VII will be dismissed.

### 8. Tortious interference with contractual relations - Lenders

As noted by Plaintiff in its responsive brief, the law of Delaware and New Jersey is substantially the same for both this tort, and for tortious interference with prospective business advantage.  (Pl. Brief in Opp. at 40).  To state a claim for tortious interference with contractual relations under Delaware law, Plaintiff must allege that there is "(1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury."  Aspen Advisors LLC v. United Artists Theatre Co., 861 A.2d 1251, 1266 (Del. 2004).  Similarly, New Jersey law requires "(1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage."  Dello Russo v. Nagel, 817 A.2d 426 (N.J. Super. Ct. App. Div. 2003).

The complaint fails to state a cause of action for tortious interference with contractual relations under either Delaware or

39

New Jersey law.  Because Plaintiff is suing derivatively on behalf of Fedders, Plaintiff can only assert this cause of action with regard to broken contracts that caused damage to Fedders. Plaintiff has not pled facts to support any of the elements for this claim.  Plaintiff has not identified a single contract between Fedders and a third party that was breached by the third party because of the Lenders' conduct, let alone damages or injury resulting from the breach.  In fact, the complaint pleads the opposite – it alleges that the Lenders' actions "induced Fedders' creditors[,] who necessarily would interpret new financing as a positive development, to continue to do business with Fedders and stretch payables."  (Compl. at ¶ 82). Accordingly, Count VIII must be dismissed.

**9. Tortious interference with prospective business advantage - Lenders**

The tort of interference with an existing contract and of interference with prospective business advantage are closely related.  Each tort is derived from the common law rule against restraints of trade.  <u>DeBonaventura v. Nationwide Mut. Ins. Co.</u>, 419 A.2d 942, 947 (Del. Ch. 1980).  Accordingly, the elements are somewhat similar.

To state a claim for tortious interference with prospective business advantage under Delaware law, Plaintiff must allege "(a) the reasonable probability of a business opportunity, (b) the

intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner." <u>Id.</u> To state such a claim under New Jersey law requires (i) "allegations of fact giving rise to some 'reasonable expectation of economic advantage'"; (ii) "facts claiming that the interference was done intentionally and with 'malice'"; (iii) "facts leading to the conclusion that the interference caused the loss of the prospective gain"; (iv) and "that the injury caused damage." <u>Printing Mart-Morristown v. Sharp Electronics Corp.</u>, 563 A.2d 31, 37 (N.J. 1989).

The complaint fails to state a cause of action for tortious interference with prospective business advantage under either Delaware or New Jersey law.  Because Plaintiff is suing derivatively on behalf of Fedders, Plaintiff can only assert this cause of action with regard to lost opportunities that caused damage to Fedders.  Just as with Count VIII, Plaintiff has not pled facts to support any of the elements for this claim. Plaintiff has not identified a single lost business opportunity, pled facts showing that there was any intentional interference with this opportunity by the Lenders or others, facts tending to support causation, or damages to Fedders.  Accordingly, Count IX must be dismissed.

41

## 10. Improvident lending - Lenders

Count X asserts a cause of action under state law for "improvident lending."  More specifically, the complaint alleges that the Lenders closed on the loans discussed above despite the fact that Fedders' sales figures were shrinking.  It also alleges that the Lenders "obtained liens on most of Fedders' assets; collected their millions of dollars in fees (not to mention performance-based compensation for the Lenders' deal teams); saddled Fedders with their legal and other professional fees – then sat back and waited for the inevitable defaults to begin." (Compl. at ¶ 81).

Because no Delaware or New Jersey state court has recognized a cause of action for "improvident lending," however, this Court is obliged to consider whether the New Jersey and/or Delaware Supreme Court would recognize such a cause of action, and on what terms, before deciding whether Count X states a claim for which relief may be granted.  See generally Packard v. Provident Nat. Bank, 994 F.2d 1039, 1049 (3d Cir. 1993) (discussing the role of a federal court when predicting state law).

The court in Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC), 321 B.R. 128 (Bankr. D. Del. 2005) predicted that the Delaware Supreme Court would recognize a cause of action for improvident lending where it is shown that a lender breached "a duty of care in lending" by having "knowledge of the inadequacy

of consideration received by the Debtor" in the case, whom the
defendant bank lent funds to in connection with a leveraged
buyout transaction.  The decision in OODC identified three cases
in support of its ruling, each decided under the law of states
other than Delaware and New Jersey.

The first of these three cases, Peck v. Chase Manhattan
Bank, N.A., 190 A.D.2d 547 (N.Y. App. Div. 1993), denied a motion
to dismiss a count for commercial bad faith based on allegations
that a bank had actual knowledge of and complicity in fraud.  The
second case, Hill v. Equitable Bank, N.A., 655 F.Supp. 631 (D.
Del. 1987), noted that an earlier Maryland court had held that a
lending bank has a duty of reasonable care in processing loan
applications of a potential borrower.  Id. at 650-51.  The court
in Hill held that, under Maryland law, this duty encompassed a
claim for negligent misrepresentation against a bank for
misstating the soundness of an investment it advocated.  Id. at
649-50.  Finally, Ramsdell v. Bowles, 64 F.3d 5 (1st Cir. 1995),
presented a similar holding.  There, the First Circuit held that
allegations of "the Bank's representations that the ... contract
would generate sufficient cash to repay the ... loan .... [and] a
failure by the Bank to prepare cash projections, a business plan,
and loan analysis in a professional manner .... might withstand a
motion to dismiss."  Id. at 10-11.  However, because the court in
that case was considering a motion for summary judgment and the

43

plaintiff had failed to present any evidence to support her

allegations, judgment was entered in favor of the Bank.  Id.

The Court notes that "the decisions are legion which deny a

cause of action for negligent underwriting of a loan through

loose internal lending standards or poor business judgments" in

other states.  FDIC v. Fordham (In re Fordham), 130 B.R. 632, 648

(Bankr. D. Mass. 1991) (collecting cases).  Likewise, the Court

observes that "improvident lending" claims have not fared well in

other jurisdictions recently.  See Price v. EquiFirst Corp., No.

08-1860, 2009 WL 917950, at *8 (N.D. Ohio April 1, 2009)

(summarily rejecting "improvident lending" as a cause of action

under Ohio law).  With all due respect to the ruling in OODC,

this Court is constrained to conclude that, if the New Jersey

Supreme Court or the Delaware Supreme Court were to consider the

issue, both courts would embrace this line of authority and hold

that a cause of action for improvident lending does not exist.

In doing so, the Court believes they would recognize that other

remedies, such as aiding and abetting breach of fiduciary duty,

lender liability premised on contractual rights (including the

implied covenant to act in good faith), common law fraud, and the

law of fraudulent transfer serve to adequately protect the

interests of those who deal with lenders.  Accord Trenwick, 906

A.2d at 174 (rejecting a cause of action for "deepening

insolvency" under Delaware law because of, inter alia, the fact

44

that other legal theories could often be brought to remedy the conduct complained of).  If the Court were to recognize a cause of action for "improvident lending," it would likely be wholly duplicative of other claims, and simply represent another cause of action under a different name.   Accordingly, the Court believes that Count X fails to state a claim for relief that may be granted.

Even if the Court were wrong, though, and the New Jersey and/or Delaware Supreme Court recognized a cause of action for improvident lending, the Court would still conclude that Count X fails to state a claim and must be dismissed.

The complaint does not plead facts that state a claim under any of the above theories of improvident lending.  Unlike in Ramsdell and Hill, there is no allegation in the complaint here – much less factual support for such an allegation – that the Lenders made an affirmative misrepresentation to Fedders regarding any matter.  Peck is likewise not applicable – Plaintiff has already pled a separate claim for breach of the implied covenant of good faith and fair dealing.  And unlike in OODC, the complaint in this case does not contain facts supporting even an inference that the Lenders had knowledge that inadequate consideration was received by Fedders in connection with the loans in this case.  In fact, the complaint shows the opposite – that Fedders received sufficient funds to allow it to

45

pay off an existing credit facility that was in default and to help the company stay in business through the summer selling season.  (Compl. at ¶¶ 74, 85, 98).  Regardless of whether staying in business for this period was a wise business decision in hindsight, the complaint makes clear – indeed alleges – that it would not have been possible without the consideration provided by the Lenders.

Accordingly, Count X must be dismissed.

**11. Unjust enrichment - all parties**

Whether asserted under the law of Delaware, New Jersey, or New York, the authorities are clear that a claim for unjust enrichment will be dismissed if the complaint alleges an express, enforceable contract that controls the parties' relationship. See Rossdeutscher v. Viacom, Inc., 768 A.2d 8, 23-24 (Del. 2001) (applying New York law); ID Biomedical Corp. v. TM Tech., Inc., 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995) (applying Delaware law); Van Orman v. Am. Co., 680 F.2d 301, 310 (3d Cir. 1982) (applying New Jersey law).  This is the case because unjust enrichment is an equitable remedy that is generally used to fill a gap that the law of contract would otherwise address, if there were a contract.  See Freedman v. Beneficial Corp., 406 F.Supp. 917, 923 (D. Del. 1975).

In this case, each of the transfers Plaintiff seeks to recover on an unjust enrichment theory were conferred in

46

accordance with an express contract – either the lending agreements or an employment agreement.  The existence and underlying enforceability of these contracts is not challenged in the complaint.  Therefore, Count XI must be dismissed.

### 12. **The covenant of good faith and fair dealing – Lenders**

Count XII asserts the Lenders violated the implied covenant of good faith and fair dealing that exists in all contracts.  The contract on which this cause of action is based contains a New York choice of law clause that the Court finds enforceable. Accordingly, the Court will apply New York law to determine whether Count XII states a claim for which relief may be granted.

Under New York law, the implied obligation of each promisor to exercise good faith encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included.  Dalton v. Educational Testing Service, 87 N.Y. 2d 384, 389 (1995).  "This embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  Id. (quoting Kirke La Shelle Co. v Armstrong Co., 263 NY 79, 87 (1933)).  The duty of good faith and fair dealing is not without limits in New York, however, and "no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship'" (Murphy v American Home Prods. Corp., 58 NY 2d 293, 304 (1983)).

47

Count XII fails to state a claim for relief under New York law.  Taking all facts in the complaint as true and granting all reasonable inferences in favor of plaintiff, the complaint does not plead that the Lenders breached any promise which Fedders reasonably believed was included in its agreement.  The complaint also fails to allege any facts showing conduct by the Lenders that deprived Fedders of the money it borrowed under the credit agreement with the Lenders.  In fact, the complaint pleads the opposite – it shows that Fedders did receive the funds it bargained for, on the terms it bargained for.  (See Compl. at ¶¶ 74, 85).  Consequently, it cannot be said that Fedders was denied the fruits of its agreement with the Lenders.

Even if Delaware or New Jersey law were to govern Count XII, however, the Court would be obliged to dismiss this claim.  Under Delaware law, stating a claim for breach of the implied covenant of good faith and fair dealing requires an allegation of "arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract."  ACE & Co., Inc. v. Balfour Beatty PLC, 148 F.Supp. 2d 418, 426 (D. Del. 2001) (quoting Cantor Fitzgerald, L.P. v. Cantor, No. 16297, 2000 WL 307370, at *15 n. 51 (Del. Ch. March 17, 2000) (emphasis added)).  A similar standard has long been used by the New Jersey Supreme Court.  See Wilson v. Amerada Hess Corp., 773 A.2d 1121, 1126-27 (N.J. 2001)

(quoting cases going back to 1965).

Once again, the complaint fails to allege any facts showing conduct by the Lenders that deprived Fedders of the money it borrowed under the credit agreement with the Lenders.  The opposite is true, according to the facts in the complaint.  Count XII must be dismissed, whether governed by Delaware, New Jersey, or New York law.

### 13. Equitable subordination - Lenders

Although the Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest," 11 U.S.C. § 510(c)(1), equitable subordination is a "drastic" and "unusual" remedy.  In re Radnor Holdings Corp.,353 B.R. 820, 841 (Bankr. D. Del. 2006). The complaint asserts this remedy only against the Lenders.

The complaint does not allege that the Lenders exercised such control over Fedders that they should be treated as "a person in control of the debtor" under 11 U.S.C. § 101(31)(B)(iii), nor is there an allegation that the Lenders are otherwise insiders or fiduciaries of Fedders for purposes of equitable subordination.  The law is well-settled that where, as here, the defendant is not an insider or fiduciary of the company, "the party seeking to apply equitable subordination bears a higher burden of proof in which he or she must show that

the respondent engaged in egregious conduct such as fraud, spoilation or overreaching." Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas, LLC (In re Epic Capital Corp.), 307 B.R. 767, 772 (D. Del. 2004). See also In re M. Paolella & Sons, Inc., 161 B.R. 107, 117-119 (E.D. Pa. 1993), aff'd 37 F.3d 1487 (3d Cir. 1994). Moreover, these facts must be pled with particularity. Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.), 329 B.R. 438, 447 (Bankr. D. Del. 2005). Because the complaint does not plead any facts that would support such a finding, let alone plead them with particularity, Count XIII must be dismissed.

**14. Recharacterization - Lenders**

The complaint alleges that the Lenders knew the loans they provided to Fedders would be in default at the time the agreements providing for the loans were executed. (Compl. at ¶ 158). Therefore, the complaint contends, the Court should "look beyond the form of" the transaction with the Lenders "consider the transaction's substance to determine whether it should be recharacterized from debt to equity." (Compl. at ¶ 159). It also contends that, in order to achieve justice, in light of the Lenders' misconduct, any claim of the Lenders against the Debtors' estates should be deemed based on equity, not debt. (Compl. at ¶ 160).

The law regarding recharacterization is well-settled in this

jurisdiction.   The Third Circuit has held that the overarching
inquiry with respect to recharacterizing debt as equity is
whether the parties to the transaction in question intended the
loan to be a disguised equity contribution.   In re SubMicron
Systems Corp., 432 F.3d 448, 455-56 (3d Cir. 2006).   This intent
may be inferred from what the parties say in a contract, from
what they do through their actions, and from the economic reality
of the surrounding circumstances.   Id. at 456.
Recharacterization has nothing to do with inequitable conduct,
however.   See In re AutoStyle Plastics, Inc., 269 F.3d 726, 748-
49 (6th Cir. 2001) (discussing the differences between equitable
subordination and recharacterization).

     Plaintiff fails to plead any facts tending to support an
inference that the Lenders intended the money they transferred to
Fedders in the form of loans to be disguised capital
contributions and not loans.   Simply alleging, in a conclusory
fashion, that the Lenders knew the "loans" they provided to
Fedders would be in default at the time the agreements providing
for the loans were executed is not enough to state a claim for
recharacterization.   (See Compl. at ¶ 78).   Consequently, Count
XIV must be dismissed.

## IV.   CONCLUSION

     For the foregoing reasons, the Court finds that Counts I,
VI, VII, VIII, IX, X, XI, XII, XIII, and XIV fail to state a

claim for relief that may be granted and must be dismissed as to all defendants.  The Court also finds that Count II must be dismissed as to all defendants except Herbert A. Morey, and Counts IV and V must be dismissed as to all defendants except Salvatore Giordano, Jr.  Accordingly, the Court will dismiss these claims.

An appropriate order follows.

By the Court,

_____
Dated: May 21, 2009            Brendan Linehan Shannon
                               United States Bankruptcy Judge